UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YESENIA RIVERA GABRIEL,<br><br>                   Petitioner,<br>     v.<br><br>ANTHONY JAMES LAVISON,<br><br>                   Respondent. | CASE NO. 2:22-cv-00006-TL<br><br>ORDER GRANTING PETITION FOR RETURN OF CHILD |

      This matter is before the Court on Petitioner Yesenia Rivera Gabriel's petition for the return of her child, J.E.L.R., pursuant to the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("the Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 ("ICARA"). Dkt. No. 7. An evidentiary hearing on the merits of the petition was held on March 29, 2022. Ms. Rivera was present, represented by counsel, F. Andrekita Silva. Respondent Anthony James Lavison, representing himself pro se, was also present.

      During the evidentiary hearing, as the Court was addressing preliminary matters, Respondent conceded that Ms. Rivera could establish a prima facie case for return of the child

ORDER GRANTING PETITION FOR RETURN OF CHILD - 1

and that he could not produce sufficient evidence to establish any of the available affirmative defenses. Despite Respondent's concessions, Petitioner requested that the Court enter the documentary evidence she intended to present for her case-in-chief. After allowing Respondent time to review the proffered evidence, and hearing no objections from Respondent,[1] the Court admitted Petitioner's evidence into the record.

Having considered the arguments advanced by the parties, examined evidence, and reviewed the record in this case, the Court GRANTS the Petition and ORDERS the return of J.E.L.R. to Mexico for the reasons discussed below.

## I. FINDINGS OF FACT

Considering Respondent's concessions, and upon review of the evidence presented by Petitioner and the record in this case, the Court finds the following:

Ms. Rivera and Mr. Lavison are the parents of J.E.L.R. who was born in Arizona on July 8, 2018. Although the Parties were never married, after J.E.L.R. was born, the Parties cohabitated as a family in Sonora, Mexico. While the Parties generally shared parental responsibilities, Ms. Rivera was the primary source of financial support for the household, and Mr. Lavison was the primary at-home caregiver while she was at work and when he was present in Mexico. Mr. Lavison routinely returned to his hometown in Monroe, Washington, for long

---

[1] Although Respondent chose not to raise specific objections to any of the exhibits entered by Petitioner, Respondent expressed general concern about the content of some of the communications included in the documents. The Court notes that while the Federal Rules of Evidence generally apply, the Hague Convention and ICARA say that objections based on authenticity are not to be considered. *See* 22 U.S.C. § 9005; *see also Brosselin v. Harless*, 2011 WL 6130419, at *1 (W.D. Wash. Dec. 8, 2011). To the extent Mr. Lavison's concerns go to the relevance of any of the communications, in reaching its decision the Court has only relied on evidence that is directly relevant to the narrow issues it is required to decide in this case. To the extent Mr. Lavison's concerns go to potential hearsay statements found in any of the communications, the Court notes that most of the communications represent party admissions and regardless, many of the relevant statements would be admissible to show something other than the truth of the matter asserted (e.g., to establish a timeline of events). Fed. R. Evid. 801.

ORDER GRANTING PETITION FOR RETURN OF CHILD - 2

stretches of time. During these times, J.E.L.R. continued to reside in Mexico and was cared for by Ms. Rivera and her family that also lived in Mexico.

During one of Mr. Lavison's extended periods living in Washington, he communicated his intent to return to Mexico with his mother for J.E.L.R.'s third birthday in July 2021. Although the Parties were no longer romantically involved at the time, Ms. Rivera offered her home to Mr. Lavison and his mother while they were in town so they could spend quality time with J.E.L.R. in a familiar environment. She stayed with her family.

During their stay, Mr. Lavison and his mother took J.E.L.R. on outings, including a trip to Arizona to purchase supplies for J.E.L.R.'s birthday party. With Ms. Rivera's blessing, Mr. Lavison's mother retrieved J.E.L.R.'s birth-certificate from Ms. Rivera's mother, so they could temporarily cross the border into Arizona. On July 8, 2021, Mr. Lavison and his mother, along with other members of Ms. Rivera's family, attended the birthday party that was held at her mother's home in Sonora, Mexico.

On July 9, 2021—the day after J.E.L.R.'s birthday—Ms. Rivera learned through text message that Mr. Lavison and his mother had again taken J.E.L.R. on a shopping trip to Arizona. Although they did not provide advanced notice, Ms. Rivera did not oppose the trip but did solicit updates via text message throughout the day. After not receiving any response to her subsequent text messages, Ms. Rivera returned to her home after work and discovered that Mr. Lavison, his mother, and J.E.L.R. had not returned from their shopping trip. She discovered that many of J.E.L.R.'s possessions, as well as her guests' luggage, were missing. After several hours of not responding to her calls or text messages, Ms. Rivera finally received a text message response from Mr. Lavison, who admitted that he unilaterally decided to take J.E.L.R. with him back to Washington. Prior to July 9, 2021, J.E.L.R had not lived anywhere other than in Sonora, Mexico.

ORDER GRANTING PETITION FOR RETURN OF CHILD - 3

Over the next several days, Ms. Rivera attempted to discern Mr. Lavison's intentions. Through extensive text message communications, Mr. Lavison expressed his intent take J.E.L.R. for a two-week visit to spend time with his family in Oregon and Washington, to which Ms. Rivera eventually agreed. Throughout the next two weeks, Ms. Rivera maintained communication with Mr. Lavison, requesting regular updates, pictures, and videocalls with J.E.L.R. She also regularly attempted to confirm Mr. Lavison's intentions with regard to returning to Mexico and offered to cover costs for their return. As the two-week period was coming to a close, Mr. Lavison requested an additional week. Again, Ms. Rivera reluctantly consented. At the end of the third week, Mr. Lavison again refused to return with J.E.L.R. On July 30, 2021, Ms. Rivera reported J.E.L.R.'s abduction to the police in Sonora, Mexico.

Over the next several weeks, Ms. Rivera remained in contact with Mr. Lavison via text message in an attempt to clarify his intentions and to remain informed about her son. By mid-August, Mr. Lavison had agreed to fly back to Mexico with J.E.L.R. However, on August 17, 2022, the day of the flight, Mr. Lavison and his son were removed from the plane by the flight crew prior to departure because J.E.L.R. was having an inconsolable panic attack and was disturbing other passengers. Although disappointed, Ms. Rivera offered to make other arrangements for them to fly down at a later date, including offering to buy a round-trip ticket for Mr. Lavison's mother to travel with them, as they believed that would make the trip easier for J.E.L.R.

Mr. Lavison's mother would not commit to travelling with them back to Mexico. The Parties' communications became strained after this incident. Ms. Rivera was not able to gauge Mr. Lavison's commitment to returning J.E.L.R., and Mr. Lavison began questioning whether she was committed to their romantic reunion.

<215>

After nearly two weeks without a substantive update from Mr. Lavison regarding his intentions to return with J.E.L.R., on August 30, 2021, Ms. Rivera filed an Application for Return with the Mexican Central Authority under the Hague Convention, which forwarded her request to the U.S. Department of State. In response, the State Department sent Mr. Lavison a letter, dated September 16, to see if he would consent to working with Ms. Rivera to resolve the matter without having to resort to litigation. There is no evidence that Mr. Lavison ever responded to the State Department's letter.

Also in September, Ms. Rivera communicated to Mr. Lavison her intention to travel to Washington in order to resolve their dispute. She arrived in Washington on September 20, 2021. She also had family members from Arizona drive up and meet her at the airport in Seattle. She was in regular communication with Mr. Lavison throughout her visit and made clear that she wanted to see her son and intended to return with him to Mexico. After a failed attempt to visit her son at Mr. Lavison's residence, the Parties began discussing the possibility of coming to agreement on a formal parenting plan. Mr. Lavison began suggesting that Ms. Rivera could relocate to the United States instead. Although he committed to assisting her in making this transition, at the time he was unemployed and living with his parents.

Ms. Rivera was in Washington for more than 10 days, during which time Mr. Lavison refused to meet with her, allow her to see her son, or disclose the location of her son. He accused her of escalating the situation by asserting her Hague Convention rights with the Mexican and United States governments, by expressing her intent to return with J.E.L.R. to Mexico, and by having her family members with her when she attempted to visit his residence. Around this time, he also began asserting that Ms. Rivera's home in Sonora, Mexico was unsafe, and he would not permit J.E.L.R. to return there. To show that the area was unsafe, Mr. Lavison pointed to general

crime statistics and the U.S. State Department's travel advisories regarding the area, as well as the fact that Ms. River Gabriel maintains a high wall and other protective barriers at her home.

After returning home from Washington, on October 13, 2021, Ms. Rivera filed a petition for custody in family court in Mexico. After securing counsel to represent her in the United States, she also initiated this Petition on January 4, 2022.

## II. CONCLUSIONS OF LAW

Ms. Rivera brings this petition under the Hague Convention and ICARA, which are intended "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and ... to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. The United States and Mexico entered into the Hague Convention on October 1, 1991. "When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (citations omitted). If a prima facie case for return is established, the child must be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

A.  **Petitioner's Prima Facie Case**

To establish a prima facie case for the return of a child, Petitioner must demonstrate by a preponderance of the evidence that: (1) the child at issue is under the age of sixteen; (2) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (3) the child was removed or retained in breach of the petitioner's custody rights under the law of the country of habitual residence; and (4) the petitioner was exercising those rights at the time of the child's wrongful removal or retention. 22 U.S.C. § 9003. Mr. Lavison stated at the hearing that he did

not dispute any of these elements. Nonetheless, the Court will briefly state the evidence for each element.

It is undisputed that J.E.L.R. was three years old at the time of his removal from Mexico.[2]

With regard to the habitual residence element, the Supreme Court has stated that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *See Monasky v. Taglieri*, 140 S.Ct. 719, 726 (2020). The Court finds that J.E.L.R continuously resided in Sonora, Mexico with his mother, Ms. Rivera, from shortly after the date of his birth to July 9, 2021, the date of his removal to—and subsequent retention in—the United States by Mr. Lavison. Mr. Lavison periodically traveled to and stayed in Mexico with Ms. Rivera and J.E.L.R. during this period. The facts support a finding that J.E.L.R. was at home in Sonora, Mexico at the time of his removal. Therefore, J.E.L.R.'s habitual residence at the time of his removal was Sonora, Mexico.[3]

Upon ending their romantic relationship sometime before J.E.L.R.'s removal from Mexico, the Parties chose not to invoke the help of the Mexican courts to establish their respective custody rights as a matter of law.[4] Mr. Lavison admitted in his Answer to the Petition

---

[2] Respondent's concession of this element is consistent with his admissions in his Answer to the Petition. Dkt. No. 22 at ¶¶ 1, 4.8.

[3] Respondent's concession of this element is consistent with his admissions in his Answer to the Petition. Dkt. No. 22 at ¶¶ 3.66, 4.1.

[4] The Court takes judicial notice of the certified translation of the Family Law Codes of the State of Sonora, Mexico, provided by Petitioner as Appendix A to her Motion for *Ex Parte* Immediate Temporary Restraining Order and Order to Show Cause. Dkt. No. 9 at 17-28. Specifically, Title IV, Chapter I, Article 315.1, which states

> When parents of a born out of wedlock child separate, both will continue to exercise parental authority but must agree on who will retain custody of the minor . . . and the right of the noncustodial parent to monitor and relate with the minor, [sic] in case of no agreement on this point, Judge will designate custody on the parent that best guarantees the integral development of the minor . . . on the same terms as in a no fault divorce.

The Court notes that Ms. Rivera has since initiated custody proceeding in Mexico.

ORDER GRANTING PETITION FOR RETURN OF CHILD - 7

that Ms. Rivera had a right of custody and was exercising those rights at the time of J.E.L.R.'s removal. Dkt. No. 22 at ¶ 4.6.

Finally, at the time of J.E.L.R.'s removal, he was clearly living full-time and being cared for by Ms. Rivera, with the help of her mother when she was at work and Mr. Lavison during the sporadic times he was present in Mexico. It follows that Ms. Rivera was exercising her custody rights at the time of J.E.L.R.'s removal.[5]

Therefore, the Court finds that Ms. Rivera has established a prima facie case for the return of J.E.L.R. to his habitual residence in Mexico.

**B.      Mr. Lavison's Article 13 Affirmative Defenses**

In his Answer to the Petition, it appeared that Mr. Lavison intended to raise two affirmative defenses recognized under Article 13 of the Hague Convention: (1) that Petitioner consented to or subsequently acquiesced in J.E.L.R.'s removal and retention, and (2) that "there is a grave risk that [J.E.L.R.'s] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Dkt. No. 22 at ¶¶ 3.42-3.43, 3.47-3.48, 3.50, 3.58, 3.66, 4.2-4.5, 4.9, 5.3. At the outset of the hearing, Mr. Lavison clarified that he no longer intended to assert consent and acquiescence as a defense and that he would only be proceeding with the defense of grave risk. The Court then asked Mr. Lavison if he understood that he would bear the burden of proving the grave risk defense by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2). Upon acknowledging that he understood the required burden of proof, Mr. Lavison admitted that he was not prepared to present sufficient evidence to establish the defense and affirmatively abandoned all of his available defenses under the Hague Convention.

---

[5] Respondent's concession of this element is consistent with his admissions in his Answer to the Petition. Dkt. No. 22 at ¶ 4.6.

The Court confirmed that Mr. Lavison understood that because of his concessions, the Court would be required to order the return of J.E.L.R. to Mexico.

### III. ORDER

As Ms. Rivera met her burden of establishing a prima facie case for return, and Mr. Lavison conceded he did not have any defenses, the Court GRANTS the Petition. Dkt. No. 1. The Court hereby ORDERS that:

1. J.E.L.R. shall return to his habitual residence in Sonora, Mexico in the custody of his mother, Petitioner Yesenia Rivera Gabriel. Pursuant to its Order Modifying Provisional Remedies (Dkt. No. 43), the Court understands J.E.L.R. to be in Petitioner's physical custody at the time this Order is entered. The child will remain in Petitioner's custody, and Petitioner shall make all necessary arrangements for his return to Mexico and report his return to the appropriate Central Authority.

2. Petitioner's counsel shall file a notice informing the Court within 48 hours of J.E.L.R.'s successful return to Mexico.

3. Petitioner's counsel may also move for appropriate attorney fees and costs per 22 U.S.C. § 9007(b)(3) to be imposed on Respondent. The motion shall be filed within twenty-one (21) days of this Order. The motion for costs shall be appropriately noted as a third Friday motion. LCR 7(d)(3). Respondent will have the opportunity to respond to the motion to show that an order imposing the requested attorney's fees and costs would be clearly inappropriate. Respondent shall file his response by no later than the Monday before the noting date. *Id.* Petitioner may then file a reply brief by no later than the noting date. *Id.*

This Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

ORDER GRANTING PETITION FOR RETURN OF CHILD - 9

IT IS SO ORDERED.

Dated this 30th day of March 2022.

                                                          _____
                                                          Tana Lin
                                                          United States District Judge